**Eunice FOSTER a/k/a Eunice Foster Holland, Plaintiff,**

v.

**ROBERTS DAIRY COMPANY, LLC Defendant.**

**No. 8:03CV469.**

United States District Court, D. Nebraska.

March 11, 2005.

W. Craig Howell, Howell, Wilson Law Firm, Thomas M. White, White, Wulff Law Firm, C. Thomas White, White, Wulff Law Firm, Omaha, NE, for Eunice Foster, Plaintiff.

Michaelle L. Baumert, Blackwell, Sanders Law Firm—Omaha, Omaha, NE, Colby A. Irving, Tribler, Orpett Law Firm, Chicago, IL, Angela M. Lisec, Blackwell, Sanders Law Firm—Omaha, Nicole B. Theophilus, Blackwell, Sanders Law Firm—Omaha, Omaha, NE, Joy A. Nesbitt, Tribler, Orpett Law Firm, Chicago, IL, for Roberts Dairy Company LLC, A Limited Liability Company, Defendant.

## ORDER

PRATT, District Judge.

Before the Court is Defendant, Roberts Dairy Company, LLC's ("Roberts Dairy"), Motion for Summary Judgment (Clerk's No. 63). Plaintiff, Eunice Foster ("Foster"), filed the present Complaint on November 18, 2003, alleging that her employer Roberts Dairy discriminated against her in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. Federal district courts have original jurisdiction over such claims pursuant to 28 U.S.C. sections 1331 and 1343. Roberts Dairy filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 on November 23, 2004 (Clerk's No. 63). Plaintiff submitted a Brief in Opposition to the Motion (Clerk's No. 72), to which Defendant replied (Clerk's No. 74). The matter is fully submitted.

## I. BACKGROUND

Foster, an African–American female, began working at Roberts Dairy on May 31, 2000, as an Accounts Receivable Clerk with a starting salary of $9.75 per hour. Foster was the only African–American working in her department from the time of her hire and continued to be the only African–American in the department until her termination on June 17, 2002. Roberts Dairy's company policy is that "there be no discrimination because of race ... in hiring, promotion, pay, transfer, or any other conditions of employment." When she was hired, Plaintiff received an employee handbook which contained complaint procedures, however, Roberts Dairy

did not conduct training or instructions on the contents of the handbook. As an Accounts Receivable Clerk, Plaintiff was responsible for researching all short paid invoices and any improper deductions made from Roberts Dairy's accounts. In addition, Plaintiff states that she would assist Roberts Dairy's customers and maintain files. Tim Nelson ("Nelson"), the Roberts Dairy Office Manager and EEO and Affirmative Action Compliance Officer, was the supervisor of the department in which the Plaintiff worked, and Michelle Boettger ("Boettger") was Plaintiff's immediate supervisor at the time Plaintiff was hired. Plaintiff was trained in her position by Nikki Stevens ("Stevens"), a Roberts Dairy employee who worked in the computer room, but had previously worked in the Accounts Receivable department.

Foster's first complaints of racial discrimination stem from comments made by her immediate supervisor, Boettger. Boettger allegedly "snapped at [P]laintiff," asked her "what are you looking at," and said on one occasion "we don't have people walking down our street that look like you. I live in Malvern, Iowa so I don't have to look at people like you." Additionally, Plaintiff alleges that Boettger was rude and on occasion would "stick her lips out, trying to speak in a slang voice when she would be rude." Foster complained to Nelson about the comments made by Boettger, and Nelson told Foster that he would take care of the situation. The only evidence before the Court regarding Nelson's follow up of Foster's complaints is his statement that he spoke to Boettger about the situation. Foster, however, alleges that Nelson inadequately responded to her complaints, would brush aside her com-

plaints, and simply told her it was "Boettger's way" to act as alleged. Roberts Dairy corporate representative, Thomas Fredrickson, testified at his deposition that he was never informed of the race-based complaint involving Boettger. Boettger later resigned from her position at Roberts Dairy.[1] Plaintiff did not apply for the vacant supervisor job, nor did she talk to anyone about wanting the job. On August 30, 2000, Plaintiff received a wage increase from $9.75 per hour to $9.95 per hour, on Nelson's recommendation.

A few months after Boettger's resignation, Roberts Dairy hired Shonia Struck ("Struck") as Boettger's replacement. During the three month interim before Struck was hired, Foster performed the job duties of both her position and Boettger's former position. Once Struck was hired, as a part of this program, Foster trained Struck on how to do the duties associated with her position.[2] Foster alleges that treatment towards her worsened after Struck was hired. Foster claims that her job duties were reassigned to Struck, despite the fact that Struck struggled with the new tasks. Plaintiff was never given any explanation for why her duties were taken from her, but neither did Plaintiff ever directly complain to Nelson about the changes.

Additionally, Plaintiff states that on multiple occasions Struck would imitate a black female television character from the Martin Lawrence show named "Sheneneh" that was a comic stereotype character derogatory to black women. The imitation would include Struck sticking out her lips, walking with her butt hunched up and bent over, and speaking in exaggerated street

---

1. There is no evidence regarding what the reasons were for Boettger's resignation.

2. Roberts Dairy has a policy of cross training employees in the same department to perform

each other's job duties so that if an employee is absent from work because of illness, vacation, etc. the absent employee's work will be able to be completed by their coworkers.

slang. Plaintiff complained to Nelson regarding Struck's impersonations and Nelson told her she was overreacting, however, Nelson also reported one incident to Fredrickson, who in turn spoke with Struck. Also, in response to the situation, Nelson ordered cubicles and dividers to surround the office employees' desks so that their view of their co-workers was obstructed during work hours.

Plaintiff asserts that her disparate treatment was perpetuated by Nelson as well. Specifically she identifies a conversation she had with Nelson where he told her that his high school football team once played an Omaha team with "a lot of black people" and that they "whipped their butts." Plaintiff also notes that Nelson referred to the women in the office as "his girls" and told his wife that the women he works with "look like Heather Locklear." [3] She complains that her white female co-workers were given privileges that were denied to her: First, that Nelson allowed white co-workers to take many breaks outside of the building that were not timed; Second, that her white female co-workers were allowed to leave work to get breakfast at fast-food restaurants. Plaintiff argues that she, in contrast, was watched and timed whenever she would leave her desk, even on bathroom breaks.

On January 1, 2001, Plaintiff received a pay increase from $9.95 per hour to $10.25 per hour. In July 2001, Kaylene McDaniel ("McDaniel") became the Assistant Office Manager that supervised the customer service department, computer ordering department, receptionist desk, and accounts receivable department along with Nelson. In August 2001, Stevens, a white female who originally trained Foster, was given Plaintiff's deposit assignments. About September 2001, Nelson changed Plaintiff's job description from Accounts Receivable Clerk to Accounts Receivable Support. Plaintiff contends that the removal of the deposit responsibilities caused her to lose overtime pay. Additionally, Plaintiff was no longer allowed to answer phone inquiries, was not allowed to place her name on faxes, and could only fax materials under Struck's name. Defendant responds by stating that it gave Plaintiff new duties of researching old invoices, though Plaintiff asserts these new duties were humiliating.

To complete the new duties, Plaintiff was told to move to a new work space. The work space was located inside an old vault supply room, and her work desk was a small child's school desk. Plaintiff was isolated from other employees, unless they came into the room to retrieve supplies. Defendant states that Foster was told to work in the supply closet because the researching involved carrying heavy boxes and Roberts Dairy did not want her to strain her back. However, Plaintiff asserts that she specifically requested that she be able to do the research work at her old desk and that she was refused this request with no explanation given. Defendant offers no explanation of why Plaintiff was placed at a child's desk rather than a standard size desk. Plaintiff continued to work in this space from September 2001 until November 28, 2001, when Nelson informed Plaintiff that the Accounts Receivable Support position had been eliminated.

Nelson told Plaintiff that she could continue her employment at Roberts Dairy either as an Accounts Payable Clerk, or she could work in Customer Service. At this same meeting, Plaintiff asked whether anyone had been hired to fill the vacant receptionist position. Plaintiff was given the position of receptionist, which she preferred because it had a greater availability of overtime. In her new receptionist position, Plaintiff continued to do many of

---

**3.** Heather Locklear is a blond, white, female actress.

Struck's duties under Nelson's orders.[4] Nonetheless, Plaintiff did not receive a pay raise on January 1, 2002. Roberts Dairy explains that she did not receive a raise because she was already making more money than other receptionists. Plaintiff refutes this explanation as pretext and maintains that it was common knowledge that Roberts Dairy employees receive end-of-the-year raises. Plaintiff also contends that the receptionist position was more of an "accounts receivable position without the pay raise" because she continued to perform duties of her Accounts Receivable position.

On January 16, 2002, Plaintiff filed a complaint with the Nebraska Equal Opportunity Commission ("NEOC") against Roberts Dairy. In her complaint, Plaintiff checked the race and color discrimination boxes beginning in May 2000, and checked the box for continuing action. Plaintiff did not mark the retaliation box on her charge of discrimination. In the charge Plaintiff listed various complaints, including: the transfer of her duties to Struck and Stevens; the change in duties and job title from Account Receivable Clerk to Accounts Receivable Support; and the eventual elimination of the support position. Specifically, Plaintiff noted that she was performing at a satisfactory level, but nonetheless duties were taken away from her, and she also noted the racial gestures made by Struck, for which no disciplinary actions were taken.

Plaintiff received her first formal Disciplinary Action Notification on February 8, 2002 in regards to attendance. There is conflicting evidence in the record regarding Plaintiff's attendance history at Roberts Dairy. In her annual evaluation for 2000 and 2001 she received satisfactory marks under attendance, however, both years there were comments added indicating that Plaintiff needed to work on attendance issues.[5] No formal reprimands regarding attendance were filed against Plaintiff, however, until after she filed her complaint with the NEOC. The February 8, 2002 incident occurred when Plaintiff had left her desk to run across the street and retrieve a doctor's note from her husband. Plaintiff asserts that the February 8, 2002 Disciplinary Action Notification was premised on a misunderstanding and was later removed. On June 24, 2002, McDaniel gave Plaintiff a Final Warning for missing eleven workdays in a six month period. The warning stated: "[C]annot miss any unscheduled days from work until after July 31, 2002; and then must be within the guidelines of our absenteeism and tardy policy." On Monday July 15, 2002, was absent from work for four hours and this time was credited to her vacation. The next day, July 16, 2002, Plaintiff called McDaniels' cell phone around 7:15 a.m. and asked if she could have the day off and have it deducted from her vacation. McDaniels originally approved the request, but called back approximately fifteen to thirty minutes later and withdrew the approval. Plaintiff told McDaniels that she had already taken steps in reliance on McDaniels' previous approval, and would not be coming into work that day. On July 17, 2002, McDaniel informed Plaintiff that her employment was terminated after Nelson concluded Plaintiff should be discharged for missing twelve days of work in a six month period.

On August 16, 2002, the NEOC found that there was sufficient evidence to support a reasonable cause finding that discrimination had occurred as alleged. The

---

**4.** Plaintiff notes that she trained Struck and had significantly better evaluations that Struck.

**5.** Plaintiff points out that Struck, in contrast, received the unacceptable rating of two in regards to attendance.

commission found reasonable cause as to all issues: pay/compensation; discipline; demotion; and terms and conditions of employment. The Commission Determination was sent to both parties along with a copy of the proposed Conciliation Agreement. On October 18, 2002, the NEOC noted that conciliation was unsuccessful, and the NEOC administratively closed and dismissed the case due to the fact that the Plaintiff could pursue the matter in Federal District Court. The United States Equal Employment Opportunity Commission ("EEOC") mailed Plaintiff her Notice of Right to Sue, under Title VII, on August 18, 2003. The notice stated that the lawsuit must be filed within 90 days from her receipt of the notice, or her right to sue on the charge would be lost.

Plaintiff filed her Complaint with this Court on November 18, 2003. The Complaint stated that Plaintiff had her job duties "stripped away from her by Defendant and given to a less-qualified white employee." The Complaint states: "Roberts Dairy has discriminated and retaliated against Plaintiff because of her race with respect to the terms and conditions of her employment by stripping away her duties, eliminating her positions, not giving her a raise or paying her overtime when the same was required and/or enforced of white employees in similarly situated positions, thereby engaging in unlawful employment practices prohibited by 42 U.S.C. 2000e–2(a)."

Plaintiff charges that Roberts Dairy illegally discriminated against her on the basis of her race, in violation of Title VII. Plaintiff's Complaint also alleges retaliation in violation of Title VII. Defendant denies Plaintiff's claims and asserts that summary judgment is proper based on the present record because: 1) Plaintiff failed to exhaust her administrative remedies; 2) she cannot establish a prima facie case of race discrimination; 3) she cannot estab-

lish a prima facie case of hostile work environment harassment; and 4) even if a prima facie case can be established, Roberts Dairy exercised reasonable care to prevent racial harassment and correct the harassment plaintiff reported.

## II. SUMMARY JUDGMENT STANDARD

All Federal Rules of Civil Procedure are to "be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. Summary judgment, however, is not merely a paper trial. "The district courts' role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 10A *Charles A. Wright, Arthur R. Miller & Mary Kay Kane* § 2712, at 574–78. The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge*, 24 F.3d at 921.

As employment actions are inherently fact based, the Eighth Circuit has repeatedly cautioned that summary judgment should "seldom be granted ... unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir.1998) (citations omitted). *See also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*,

931 F.2d 1239, 1244 (8th Cir.1991)) ("summary judgment should seldom be used in employment discrimination cases"); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim ... and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v. Deaconess Med. Ctr.-West Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)). Nevertheless, the plain language of Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Snow v. Ridgeview Med. Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 762 (8th Cir.1995)). Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994); *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Publ'g v. Merideth Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic,* 691 F.2d 405, 408 (8th Cir.1982).

## III. LAW AND ANALYSIS

In Title VII employment discrimination cases, plaintiffs are required to establish a prima facie case of discrimination under the *McDonnell Douglas* burden shifting framework. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Hammer v. Ashcroft,*

383 F.3d 722 (8th Cir.2004). Under *McDonnell Douglas,* the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff establishes a prima facie case, the burden of production shifts at the second stage to the defendant, who must articulate some legitimate non-discriminatory reason for the adverse employment action. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant satisfies this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. 1089. The burden then shifts back at the third and final stage to the plaintiff who is given the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. *Id.* At 253. The ultimate burden remains with the plaintiff at all times to persuade the trier of fact that the adverse employment action was motivated by intentional discrimination. *Id.*

### A. *Exhaustion of Administrative Remedies*

Defendant's first argument in support of summary judgment is that Plaintiff failed to exhaust her administrative remedies in regards to any retaliation or wrongful termination claims. "In order to initiate a claim under Title VII a party must timely file a charge of discrimination with the EEOC and receive a right-to-sue letter." *Stuart v. General Motors,* 217 F.3d 621, 630 (8th Cir.2000). The requirement that an individual must first exhaust his or her administrative remedies is important to Title VII's goals because it puts the employer on notice of the alleged violation and promotes voluntary compliance and conciliation. *Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 222 (8th Cir.1994). "The allegations of the judicial

complaint [must be] reasonably related to the administrative charges that were timely brought." *Boge v. Ringland–Johnson–Crowley Co.*, 976 F.2d 448 (8th Cir.1992). To satisfy the exhaustion requirement the administrative complaint must provide the defendant with sufficient notice of the claim to be asserted at trial. *Russell v. TG Mo. Corp.*, 340 F.3d 735, 748 (8th Cir.2003). "A claim is administratively exhausted if it is specifically stated in, grows out of, or is reasonably related to the substance of the allegations in the administrative charge or complaint." *Stuart*, 217 F.3d at 631. In determining whether the claims included in the complaint have been properly exhausted, however, "[a] court will liberally construe the administrative charges in determining whether the claims asserted in legal proceedings are reasonably related to those in the administrative complaint." *Cobb v. Stringer*, 850 F.2d 356 (8th Cir.1988).

Plaintiff filed an administrative complaint with the NEOC against Roberts Dairy on January 16, 2002. In her administrative complaint, Plaintiff alleged discrimination based on race and color. She did not mark the box marked "retaliation." Plaintiff stated that she was performing at a satisfactory level, but nonetheless duties where taken away from her and given to a less qualified white employee. She also complained of racial animus in the workplace with inadequate response from Roberts Dairy. On August 16, 2002, the NEOC found reasonable cause that the discrimination had occurred as alleged. On October 18, 2002, the NEOC noted that conciliation was unsuccessful between the parties. Plaintiff received her right to sue letter from the EEOC on August 18, 2003. Plaintiff filed her Complaint in this Court on November 18, 2003. Accordingly, there is no question that Plaintiff has properly exhausted her administrative remedies in regards to her disparate treatment and hostile work environment claim. Defen-dant, however, claims that she did not properly exhaust her remedies in regards to a wrongful termination claim or a retaliation claim.

■ In regards to her retaliation claim, it is true that Plaintiff did not mark the "retaliation" box on her original complaint. She did, however, allege retaliation in her Complaint. The Eighth Circuit has clearly stated: "[I]t is well established that retaliation claims are not reasonably related to underlying discrimination claims." *Wallin v. Minnesota Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir.1998), *cert denied*, 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999). This does not mean, however, that a retaliation claim may never be reasonably related to an administrative charge. *See Russell*, 340 F.3d at 748 (citing *Wallin* and stating: "[T]hat leaves us to consider whether Russell's retaliation claim is reasonably related to, or grows out of [the administrative charge]."). In *Russell*, the plaintiff's retaliation charge did not arise out of the administrative charge, in part because "Russell has not alleged that the retaliation resulted from her filing the administrative charge. The alleged retaliation occurred well before the administrative charge was filed." *Russell*, 340 F.3d at 748. "A claim 'alleging retaliation by an employer against an employee for filing' a discrimination charge is one type of claim we have recognized as 'reasonably related' to the underlying discrimination charge." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 687 (2d Cir.2001). Indeed, it would be impossible for a plaintiff to allege retaliation in the administrative complaint, if the retaliation stemmed from the protected activity of filing the complaint itself.

Presently, Plaintiff alleges that she was retaliated against after she filed her administrative complaint. Indeed, the first time Plaintiff was ever formally written up

for attendance issues was February 8, 2002, less than a month after she filed her administrative complaint. Although her annual evaluations noted attendance issues, she never received an unsatisfactory mark in this regard prior to the filing of the complaint. It was a direct result of these attendance write-ups that Plaintiff was terminated. The alleged retaliation, which includes the eventual termination, therefore does flow out of the administrative complaint upon which she bases the present litigation.

 Defendant also argues that Plaintiff's termination did not grow out of the administrative complaint, nor was it specifically noted in the present Complaint, and is therefore untimely. The purpose of a complaint is to put the defendant on notice of the charges against it, and there is no strict fact pleading requirement in regards to employment discrimination claims. Defendant cites *Boge v. Ringland–Johnson–Crowley Co.*, 976 F.2d 448 (8th Cir.1992), to provides support for its claim that Plaintiff's termination is not properly included in the Complaint. In *Boge*, the plaintiff had filed an administrative complaint regarding a layoff that occurred in 1986. The plaintiff was later re-hired and terminated again in October 1987. The court found that the two layoffs were not reasonably related in time or in kind. *Boge*, 976 F.2d at 451. Here, however, the termination, argues plaintiff, grew out of the initial administrative complaint and as such, should be considered a continuing violation. On her initial administrative complaint, Plaintiff marked the box "continuing treatment" and as discussed above, the termination stemmed out of the attendance issues, which were arguably done in retaliation for filing her complaint. Due to the connection between the events stated in the administrative complaint and her later filed Complaint in this court, Foster is not required to amend her Complaint to specifically note the termination date.

The connectivity of the events put the Defendant on proper notice of the charges before it.

### B. *Disparate Treatment*

#### 1. *Prima Facie Case*

Defendant next argues in its motion for summary judgment that Plaintiff cannot make out a prima facie case of race discrimination because she has failed to meet three of the four prongs of the prima facie case. To establish a prima facie case of disparate treatment based on race, Plaintiff must show: (1) that she is a member of a protected class; (2) that she performed her job satisfactorily; (3) that she suffered an adverse employment action; and (4) that there are facts that permit an inference of discrimination. *Taylor v. Southwestern Bell Tel. Co.*, 251 F.3d 735, 739–40 (8th Cir.2001). There is no question that Plaintiff meets the first prong of the test as she is an African American woman. In regards to the second prong, Plaintiff has provided the Court with annual evaluations from Roberts Dairy that indicate that she was performing her job satisfactorily. Next, the Court turns to the adverse employment action prong of the disparate treatment test.

 "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Spears v. Missouri Dep't of Corrs. & Human Servs*, 210 F.3d 850 (8th Cir.2000). Examples, of changes meeting this standard include termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects. *See Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1016 (8th Cir.1999). However, minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not qualify as adverse employment actions. *See*

*Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir.1997).

◼ Plaintiff argues that the following actions by Roberts Dairy constituted adverse employment actions: (1) termination; (2) denial of overtime; (3) denial of a raise; and (4) taking away job duties. To establish her prima facie case, Plaintiff alleges that the adverse employment actions began when her duties were taken away and given to Struck and continued until her termination in 2002. It is reasonable for a juror to infer that the taking away Plaintiff's job duties led to the elimination of her position, which forced her to transfer to a new position. Once she was at the new position she was not given an annual raise. Moreover, following the filing of her administrative complaint Roberts Dairy began writing up Plaintiff for absences for which she had never been formally written up before. Accordingly, the record presents material facts in dispute upon which a reasonable jury could find that Plaintiff suffered an adverse employment action. Accordingly, this prong of Plaintiff's prima facie case is satisfied.

In regards to the removal of Plaintiff's duties and eventual elimination of her position, Roberts Dairy argues that these are not adverse employment actions because they did not result in a reduction in Plaintiff's wages. It is undisputed that Plaintiff did not suffer a pay decrease as a result of her job duties being taken away. However, the transfer of deposits to Stevens, the change of job title, and the eventual elimination of Plaintiff's position undeniably constituted a job detriment. Plaintiff was trained in her position yet was forced to choose an alternate position from a list of jobs she was not trained for. A reasonable jury could conclude that this resulted in a material employment disadvantage for Plaintiff.

◼ The fourth prong of Plaintiff's prima facie case requires that there are facts present which present an inference of racial animus against the plaintiff. The record contains several factual allegations and supporting evidentiary materials indicating Nelson and Roberts Dairy treated Plaintiff unfairly due to her race. The isolated comments by Boettger, Nelson, and Struck, followed by the removal from her desk to a supply closet, where she had to work at a children's desk, all provide a sufficient inference of racial animus to support Plaintiff's prima facie case of racial discrimination. *See e.g., Williams v. ConAgra,* 378 F.3d 790 (8th Cir.2004) (finding epithets carrying clear racial overtones "permit an inference that racial animus motivated not only ... overtly discriminatory conduct but all ... offensive conduct towards [the plaintiff.]"); *Bowen v. Missouri Dept. of Soc. Servs.,* 311 F.3d 878 (8th Cir.2002) (same) (citing *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1097 (10th Cir.1999)); *see also Brown v. East Miss. Elec. Power Ass'n,* 989 F.2d 858, 861–62 & n. 8 (5th Cir.1993); *Gipson v. KAS Snacktime Co.,* 171 F.3d 574, 1999 WL 153038, at *5 (8th Cir.Mar.12, 1999) (dictum).

### 2. *McDonnell–Douglas Stage 2 and 3*

Once Plaintiff submits a prima facie case, the burden of production shifts to the employer to submit evidence of legitimate non-discriminatory reasons for its adverse employment actions. Roberts Dairy provides that the deposit duties were transferred to Struck and then Stevens because Plaintiff was not completing at least one deposit a day in her position. However, Plaintiff counters that this reason is mere pretext, as evidenced by her satisfactory evaluations. Further, Plaintiff alleges that any delays were a result of Nelson requiring her to do other duties or otherwise delaying her work. The deposit duties were replaced with invoicing work that Plaintiff had to perform in a supply closet.

In regards to the transfer to the receptionist position, it is undisputed that Plaintiff inquired about the receptionist position and "voluntarily" accepted the position because it had a greater potential for overtime opportunities. However, because Plaintiff's original position had been eliminated, it leaves open the question of whether the transfer was completely voluntary. Once in the position her overtime was cut and she did not receive an annual raise. Defendant asserts that Plaintiff's overtime was cut as a result of overall budget cuts and management changes at Roberts Dairy. Roberts Dairy produced evidence of across-the-board budget cuts and management changes, showing that white employees also had their schedules changed to reduce the amount of overtime that the Company was paying to employees. Plaintiff alleges that she was the first employee to have overtime cut, but produced no evidence to show that this legitimate reason stated for the cut in overtime hours was mere pretext for racial discrimination.

■ Plaintiff was also not given a pay raise in January 2002. Roberts Dairy explains that she was not given a raise because she was the highest paid receptionist at Roberts Dairy. It offered no evidence, however, that annual raises are not a routine practice at Roberts Dairy, as alleged by Plaintiff, and Defendant even contended at the NEOC hearings that Plaintiff did receive a raise in 2002. Defendant also failed to present sufficient evidence regarding the work history of other receptionists and whether or not there was a salary cap on receptionist positions. Merely producing evidence of two other receptionists who made less money than Plaintiff does not, however, satisfy Defendant's burden of production. Further, Plaintiff notes that even in the receptionist position, she continued to perform many of her former collections job duties, indicating that her performance was deserving of

an annual raise. Simply put, Roberts Dairy has not produced sufficient evidence at the summary judgment stage to show that the denial of the raise in 2002 was rooted in established company policy and was the result of legitimate non-discriminatory reasons.

■ Plaintiff was discharged on July 17, 2002 for the stated reason that she "had missed twelve days of work in a six month period in violation of Robert's Dairy and Absenteeism and Tardiness Policy." Indeed, excessive absenteeism is a legitimate, nondiscriminatory reason for terminating an employee, and if Defendant can show the twelve absences to be legitimate at trial, no reasonable juror could find that the stated reason for termination was mere pretext. *See Kinkead v. Southwestern Bell Tel. Co.*, 49 F.3d 454, 456–57 (8th Cir.1995). (Employee's excessive absenteeism was legitimate, nondiscriminatory reason for her termination). However, there simply is not clear evidence before the Court regarding Plaintiff's absences to find that there is no genuine issue of material fact in this regard. Plaintiff's evaluations in the past noted attendance issues, but she continued to receive satisfactory marks, in contrast to the marks received by Struck. Additionally, Plaintiff was not formally written up for any attendance violations until after she filed her complaint with the NEOC. These write-ups ultimately contributed to her termination. Questions remain regarding the legitimacy of these write-ups and whether they were mere pre-text for discrimination. This is particularly true with regard to the proverbial "straw that broke the camel's back," *i.e.*, Plaintiff's twelfth and final write-up prior to her termination, as a reasonable jury could conclude that Nelson's approval and subsequent withdrawal of that approval for Plaintiff's use of vacation time was inappropriate and motivated

by an illegal animus when viewed in context of all the evidence in this case. Defendant provided the Court with Plaintiff's February 8, 2002 write-up, the June 24, 2002 final warning, and the termination notice dated June 17, 2002. The record is unclear, however, regarding the specifics of the twelve absences that led to Plaintiff's termination, and whether company procedure was followed. Accordingly, the Court finds that genuine issues of material fact exist regarding the legitimacy of Defendant's stated reasons for its arguably adverse employment actions.

### C. Hostile Work Environment

"To establish hostile work environment, plaintiffs ... must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [their] employment.'" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2347, 159 L.Ed.2d 204 (2004) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Severe and pervasive harassment "offends Title VII's broad rule of workplace equality." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To prevail, the plaintiff is required to show that she is a "member of a protected group, was subjected to unwelcome harassment, the harassment was because of her membership in the group, and the harassment affected a term, condition, or privilege of her employment." *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756 (8th Cir.2004). To determine whether a work environment is objectively offense, that is, one which a reasonable person would find abusive or hostile, the Court must "examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Bainbridge*, 378 F.3d at 756.

In *Bainbridge*, the Eighth Circuit found that racially offensive remarks that occurred approximately once a month were not sufficient evidence to create a severe and pervasive environment. *Id.* However, the Honorable Richard S. Arnold, dissenting, stated: "While I concede that looking to the number of incidents per month reduces ·what is likely a horrific emotional experience to a numeric fraction, objectively, I think one comment every three months is different than one comment a month." *Bainbridge*, 378 F.3d at 762 (Arnold, J., dissenting). "In a case such as this, where there is a lot of evidence demonstrating discriminatory behavior over a sustained period of time, we should not stand in for the jury." *Id.* In the present case, viewing the facts in the light most favorable to the plaintiff, the hostile treatment Plaintiff was subjected to occurred not monthly, but daily when considering Roberts Dairy's requirement that Plaintiff work in a supply closet at a child's size desk. Coupled with Plaintiff's complaints of racially derogatory remarks, write-ups, and the loss of job duties, the Court must find at this juncture that Plaintiff has established a prima facie case sufficient to permit a reasonable jury to conclude that she was subject to a hostile work environment.

Additionally, the Court notes that while racially motivated comments, standing alone, would be insufficient to show that the conduct endured was severe and pervasive, viewing the totality of the circumstances in the light most favorable to Plaintiff, the Court must conclude that the there remains a genuine issue of material fact as to whether the harassment was sufficiently severe and pervasive to constitute a hostile work environment. Plaintiff has also proffered evidence which draws

into question whether Roberts Dairy took appropriate action in response to her complaints. Specifically, the record supports a conclusion that Nelson never reported the Boettger incident to anyone else at Roberts Dairy and often told Plaintiff that she was simply overreacting to situations. Also, one of Roberts Dairy's "solutions" was to place Plaintiff in fundamental isolation, rather than discipline those of her coworkers who allegedly committed the offensive actions.[6] During the time that Plaintiff worked in the supply closet, she alleges that she felt daily humiliation. The Court cannot say such feelings are unreasonable. Together with the other harassing incidents alleged, Plaintiff has provided enough evidence that a jury could reasonably decide that the harassment was severe and pervasive.

## IV. ORDER

For the reasons stated herein, the Court finds that genuine issues of material fact remain on each of Plaintiff's claims. Accordingly, Defendant Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

---

**6.** These questions regarding Roberts Dairy's conduct also preclude its argument for summary judgment that, as a matter of law, it "exercised reasonable care to prevent harassment and promptly corrected any reported harassing behavior." *Burlington Indus.* and *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).