# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 02-3273

_____

Taunya Russell,

        Appellant,

v.

TG Missouri Corporation,

        Appellee.

    Appeal from the United States
District Court for the
Eastern District of Missouri

_____

Submitted:  April 18, 2003

Filed:  August 26, 2003

_____

Before BOWMAN, RICHARD S. ARNOLD, and BYE, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Taunya Russell appeals from a final order entered in the United States District Court[1] for the Eastern District of Missouri granting summary judgment in favor of her former employer, TG Missouri Corporation, on her claims pursuant to the Americans with Disabilities Act ("ADA") and Title VII of the Civil Rights Act of 1964 ("Title

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

VII"). Russell v. TG Mo. Corp., No. 1:01CV72 (E.D. Mo. Aug. 9, 2002) (hereinafter "slip op."). For reversal, Russell argues that there are genuine issues of material fact on each of her claims and that TG Missouri is not entitled to judgment as a matter of law. For the reasons stated below, we affirm the order of the District Court.

I.

Jurisdiction was proper in the District Court based upon 28 U.S.C. § 1331. Jurisdiction is proper in this Court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

II.

The following summary of background facts is based upon the District Court's order, slip op. at 2-6, and the record on appeal. TG Missouri is a manufacturer of plastic automotive parts. Russell was employed by TG Missouri on a full-time basis from January 3, 1996, until her termination in October of 1999. At the time of her termination, she worked as the inspector of Line 3 of paint booth P4, where her duties included inspecting parts, packaging, assembling, and documenting defects.

Russell has been diagnosed with bipolar disorder. She began receiving psychiatric treatment for her condition in 1997. She alleges that the disorder causes her difficulty with many aspects of her day-to-day life, including social interaction, communication, maintaining relationships, eating, sleeping, and sexual functioning. Her psychological symptoms include depression, anger, and anxiety, and her physical symptoms include heart racing, sweating, and crying. Her symptoms are triggered by, among other things, stressful or unexpected situations. She takes numerous prescription medications to help relieve her symptoms.

On February 5, 1999, Russell took a thirty-day leave of absence under the Family and Medical Leave Act due to stress unrelated to her job.  On March 5, 1999, she returned to work without limitations.

In August 1999, Russell was working twelve-hour shifts.  At her request, Dr. Peter Moran, her physician, sent a letter to Michael Blaylock, her manager, requesting that her shifts be limited to eight hours per day.[2]  TG Missouri complied with  Dr. Moran's request and adjusted her hours accordingly.

 On September 6, 1999, Blaylock telephoned Dr. Moran's office to find out whether Russell was only limited to eight hours per day or whether she was also limited to forty hours per week.  Blaylock was told by someone in the office (other than Dr. Moran) that the restriction referred only to the number of hours Russell

---

[2]The text of the letter reads as follows:

Dear Mr. Blaylock:

Ms. Russell was seen today for a regular visit.
She is having trouble with increased symptoms, and she reports that she must work very long 12 hour days which is having an adverse effect on her mental status.
I would ask that you please return her to a more reasonable 8 hour per day schedule as soon as possible as she is unable to maintain the more demanding routine.

Sincerely,
/s/ Peter S. Moran, D.O.

Appellant's Appendix at 262.

could work per day, not per week.[3]  Although Blaylock informed Russell of this conversation,[4] she did not follow up with Dr. Moran to have him request an additional forty-hour per week limitation.

On Friday, October 22, 1999, at approximately 8:15 a.m., Blaylock told Russell's immediate supervisor, Carla Robertson, that the workers on Line 3 would have to report to work the next day, Saturday, October 23, to clean.  It was not unusual for TG Missouri employees to be required to clean on Saturdays, although they were usually notified the Wednesday or Thursday before.  When Robertson informed Russell that she would have to work the next day, Russell became visibly upset.  Russell alleges that she began experiencing an anxiety attack.  Both she and

---

[3]Contained in the record is a copy of a handwritten note that appears to have been created by the individual in Dr. Moran's office with whom Blaylock spoke on September 6, 1999.  The note states:

> Dr. Moran
> Mike Blaylock phoned Re: letter of Aug 13[th] regarding [Russell's] hours.  He wanted to know how long she should have this restriction and can she work 5 or 6 days (per week) as long as it[']s not [a] 12 hour day?
> Thanks.
> Kelly

Appellant's Appendix at 300.  Dr. Moran testified in deposition that he did not recall ever responding to the note.  Id. at 209.  He also observed that the note did not bear his initials, and he commented: "Almost everything I look at I put PSM on it some place to show that I read it."  Id.

[4]Russell admitted in deposition that Blaylock informed her of his call to Dr. Moran's office regarding the scope of her restriction.  Appellant's Appendix at 194 (deposition of Taunya Russell) ("[Blaylock] said, 'I contacted your doctor, and there was no restriction on the days.' . . . Well, that's what he told me, but I did not know if that was true or false.").

Robertson believed that she, Russell, was the only one being required to work that Saturday, and she felt that she was being punished for requesting a workplace accommodation. It turned out that other employees from Line 3 and Line 2 were required to work that Saturday.[5]

At approximately 11:00 a.m. on Friday, October 22, Russell told Robertson that she needed to leave. Robertson replied that it would be considered an unscheduled absence if she did. Russell indicated that she was going to leave anyway and, shortly thereafter, left without permission. She did not state that it was medically necessary for her to leave or that she was having an anxiety attack. The next day, Saturday, October 23, Russell did not show up for work. When Russell showed up for work on Monday, October 25, she was informed that she had been terminated for leaving work early on Friday without permission and for refusing to work as scheduled on Saturday – actions considered to be job abandonment and insubordination.

On December 2, 1999, Russell submitted a charge of discrimination ("the administrative charge") to the Equal Employment Opportunity Commission ("EEOC") and the Missouri Commission on Human Rights ("MCHR"). See Appellant's Appendix at 284 (the administrative charge). On the first page of the administrative charge is a section bearing the printed instructions: "CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)[)]," followed by nine

---

[5]Russell believed that she was the only worker being required to work that Saturday because Line 3 was originally the only line scheduled to come in to clean and, of the two other workers on Line 3, one was out and the other had scheduled personal leave. See Brief for Appellant at 17. Robertson stated in her deposition that she too believed Russell was the only employee being required to come in and clean that Saturday and that she felt it was unfair. See Appellant's Appendix at 221 (Deposition of Carla Robertson) ("At the time my understanding was that she was the only one to come in to do that duty and then later on there was other people going to come in so, yes, I thought at the time, when I understood it was just her, that it was unfair.").

boxes labeled: "race," "color," "sex," "religion," "national origin," "retaliation," "age," "disability," and "other (specify)." The boxes labeled "sex" and "disability" have each been marked with an "X," but there is no mark in any of the other boxes, including the box labeled "retaliation." See id. The section immediately below contains the following printed instructions: "THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))." Typed in that section is the statement, among others: "I believe Respondent wanted to fire me because I could only work 8 hours a day, 5 days a week due to my condition." Id. at 285.

In the administrative proceedings, Russell maintained that TG Missouri treated two similarly-situated male employees more favorably than her. According to Russell, Lance Evans was not terminated when he left work early without permission; he was instead given a warning. Brad Drew was not terminated when he refused to work overtime after his regular shift; he was instead given a warning.

Russell received a notice of right to sue from the MCHR and filed the present action in the District Court. She alleged: (1) disability discrimination in violation of the ADA, (2) gender discrimination in violation of Title VII, and (3) retaliation in violation of the ADA. TG Missouri filed a motion for summary judgment. Upon review, the District Court concluded that there was no genuine issue of material fact and that TG Missouri was entitled to judgment as a matter of law. Regarding her disability discrimination claim, the District Court assumed, without deciding, that Russell's bipolar disorder was a disability within the meaning of the ADA. See slip op. at 10. However, the District Court concluded that Russell could not show that her termination was caused by her disability. The District Court reasoned that there was no genuine issue of fact as to whether TG Missouri's non-discriminatory reasons for discharging Russell (i.e., job abandonment and insubordination) were pretextual, whether similarly-situated employees had been treated more favorably, or whether she had ever requested an accommodation limiting her weekly work hours. See id. at 11-12. The District Court also held that Russell's sex discrimination claim failed as

a matter of law notwithstanding her allegations of disparate treatment. See id. at 12-14. As to her retaliation claim, the District Court held that Russell had failed to exhaust her administrative remedies and therefore was barred as a matter of law from pursuing the claim. See id. at 14-16. The District Court granted summary judgment for TG Missouri, and Russell timely appealed.

III.

We review a grant of summary judgment *de novo.* The question before the District Court, and this Court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

*A. Disability discrimination*

1. Failure to accommodate theory of liability

Russell first argues that the District Court erred in granting TG Missouri summary judgment on her disability discrimination claim. She begins with the premise that "[a]n employer commits unlawful discrimination under the ADA if the employer does not make reasonable accommodations to the known mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business." Brief for Appellant at 24 (citing Cannice v. Norwest Bank, 189 F.3d 723, 726 (8th Cir. 1999), cert. denied, 529 U.S. 1019 (2000); Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944 (8th Cir. 1999); 42 U.S.C. § 12112(B)(5)(A)). According to Russell, failure to accommodate is a "specifically prohibited form of unlawful disability discrimination under the ADA." Id. at 26.

Therefore, she continues, TG Missouri's proffered nondiscriminatory reason for her termination is "completely irrelevant" to this aspect of her claim. Id. at 26-27. Russell contends that, when the evidence is viewed in the light most favorable to her, including all reasonable inferences which can be drawn in her favor, there are genuine issues of fact as to whether TG Missouri knew or should have known that she required a restriction on the total number of hours she could work per week as a result of her disability and whether TG Missouri failed to engage in good faith in an interactive process toward a reasonable accommodation of her disability. See id. at 36-38 (citing Fjellestad, 188 F.3d at 952-53; Cravens v. Blue Cross & Blue Shield, 214 F.3d 1011, 1021 (8th Cir. 2000)). She concludes that these genuine issues of fact preclude summary judgment on her claim that TG Missouri failed to act in good faith to reasonably accommodate her known mental disability, bipolar disorder, resulting in her termination.

In support of these points, Russell emphasizes the following language from Dr. Moran's letter to Blaylock requesting a workplace accommodation: "'[P]lease return her to a more reasonable 8 hour per day schedule as soon as possible as she is unable to maintain the more demanding routine.'" See Brief for Appellant at 29 (citing Appellant's Appendix at 262) (emphasis added by appellant). Russell argues:

> Viewed in the light most favorable to Russell, considering her recent stress leave, her mental disorder and the fact that she was not being required to work more than five days per week at that time, and granting her all reasonable inferences that may be drawn in her favor, Russell's request for accommodation can be interpreted as asking that she not be required to work overtime.

Id. at 30.

Russell further maintains that the events of Friday, October 22, 1999, provide "[t]he most probative evidence that [TG Missouri] failed to act in good faith to

provide [her] reasonable accommodation." Id. at 32. Russell points out, among other things, that her immediate supervisor, Carla Robertson, was well aware of her bipolar disorder. Nevertheless, when Russell was having an apparent anxiety attack that Friday morning, Robertson was unwilling to let her leave, despite Robertson's knowledge of her condition and Robertson's willingness just the day before to give her the whole Friday off.[6] She concludes that these facts reveal not only that TG Missouri failed to make a reasonable accommodation for a qualified individual with a disability, but also that TG Missouri "wanted to get rid of her" because she had requested an accommodation in her work schedule. Id. at 36.

To begin, we disagree with Russell's contention that Dr. Moran's letter of August 13, 1999, can reasonably be interpreted as stating a need for a forty-hour-per-week accommodation. The letter was written by Russell's treating physician. It notes the adverse effects of the twelve-hour work days on Russell's mental status and refers to Russell's inability to maintain "the more demanding routine." It specifically asks for "a more reasonable 8 hour per day schedule." Under these circumstances, the only reasonable interpretation is that Russell's disability required her to work no more than eight hours per day, and TG Missouri fully complied with that request. We cannot say, based upon Dr. Moran's letter to Blaylock, that there is a genuine issue of fact as to whether TG Missouri knew or should have known that Russell also required an accommodation in terms of her hours per week.

As to Russell's argument that there is at least a genuine fact issue as to whether TG Missouri failed to engage in good faith in the interactive process, we again disagree. It is not genuinely disputed that, in early September 1999, Blaylock contacted Dr. Moran's office to inquire as to whether Russell could work a six-day

---

[6]Russell testified in deposition: "The day before I had asked her [Robertson] if I could have that Friday off, and she said yes. Well, at the last minute on Thursday I said, 'Nevermind. I'll go ahead and come in. Save my vacation day.'" Appellant's Appendix at 199 (deposition of Taunya Russell).

schedule, and, shortly thereafter, he told Russell that he had called her doctor and was advised that there was no restriction on the number of days she could work per week. Therefore, regardless of whether Blaylock received unauthorized information from Dr. Moran's office or misinterpreted the information he received, Russell clearly knew that Blaylock believed that she could work a six-day schedule consistent with her restrictions. Under these circumstances, if she indeed needed a forty-hour weekly limitation, and she believed that Dr. Moran had intended to include such a limitation in his request, it was incumbent upon her to follow up to correct Blaylock's assumption. Her failure to do so, despite having the opportunity, supports the conclusion that she, not TG Missouri, stalled the interactive process insofar as her weekly hours are concerned. Consequently, it cannot reasonably be inferred from these facts that TG Missouri failed to engage in good faith in the interactive process.

As to the events of Friday, October 22, it is undisputed that Russell left her post in the middle of her shift after being told that doing so would result in an unscheduled absence.[7] At the time Russell left her post, she told Carla Robertson: "I need to leave, and I need to leave right now." Appellant's Appendix at 199 (deposition of Taunya Russell). The only reason she gave for needing to leave was that she was "not feeling well." Id. Given Russell's failure to make any reference to her bipolar disorder or her mental condition at that time, it simply cannot reasonably be inferred that Robertson failed to accommodate her disability. In sum, we hold that there is no genuine issue of fact as to whether TG Missouri failed to act in good faith to reasonably accommodate Russell's disability within the meaning and requirements of the ADA.

---

[7]In deposition, Russell was asked: "Did [Robertson] give you permission to leave?"; Russell answered: "They can't say yes or no if you can go. She just said that would result in an unscheduled." Appellant's Appendix at 199 (deposition of Taunya Russell).

## 2. Discriminatory discharge theory of liability

Russell next argues that the District Court erred in concluding that it cannot reasonably be inferred that TG Missouri's proffered reasons for her termination were a pretext for a discriminatory discharge based upon her disability.[8]  Brief for Appellant at 38-54.  In support of this argument, Russell relies upon Young v. Warner-Jenkins Co., 152 F.3d 1018 (8th Cir. 1998) (Young) (reversing summary judgment for employer on disability discrimination claim under the ADA where the plaintiff met his prima facie burden and the employer's discredited and inconsistent reasons for terminating the plaintiff gave rise to genuinely disputed issues as to pretext and, ultimately, intentional discrimination.).  In this context, "to survive a motion for summary judgment, a plaintiff must: (1) present evidence creating a fact issue as to whether the employer's proffered reason[] [is] pretextual; and (2) present evidence that supports a reasonable inference of unlawful discrimination."  Id. at 1023.  Russell maintains that she presented sufficient evidence of pretext to survive summary judgment.  The evidence shows, for example, that TG Missouri made the decision to terminate her on Friday, October 22, 1999; however, after she did not come to work on the following Saturday, TG Missouri altered its documentation of its reasons for her termination to include "insubordination" based upon her failure to appear for work that Saturday.  Russell contends that the evidence further shows that two similarly situated, non-disabled employees were not discharged under similar circumstances, and that TG Missouri did not follow its own policies when it terminated her without adequate prior warning. All this evidence, she concludes, supports the inference that TG Missouri's proffered reasons are not worthy of credence and are mere pretexts for discrimination based upon her disability.  We disagree.

---

[8]As a threshold matter, Russell maintains that she established a prima facie case under this discriminatory discharge theory.  See Brief for Appellant at 39-44.  The District Court in effect assumed, without deciding, that she had met her prima facie burden.  See slip op. at 10.  We now do the same.

The evidence does show that, on October 22, 1999, TG Missouri made the decision to terminate Russell for leaving her shift without permission and that, on the same day, Darren Blankenship filled out a "Status Change" form for Russell and checked the box for "resignation" as the "reason for change." See Appellant's Appendix at 263 (Status Change form). In his deposition, Blankenship readily admitted that the decision to terminate Russell was made on Friday, October 22, and that the status change form was altered after Russell did not show up for work on Saturday, October 23. He explained that he initially construed Russell's voluntary departure on that Friday as a "resignation," but was subsequently instructed to change the checked box to "termination." Blankenship further explained that the date was changed because, despite their attempts to contact Russell over the weekend, they were unable to notify Russell of her termination until Monday, October 25, and, moreover, that was the day on which they obtained all the necessary signatures. Appellant's Appendix at 280-83 (deposition of Darren Blankenship). Addressing the reference to Russell's "insubordination" on the Status Change form,[9] Blankenship testified:

> [T]he day in question, Friday the 22nd, when she left, that was the reason that we had ended her employment.
>
> What I will say, though, is because she also did not come in Saturday – because we were not able to contact her, . . . she already knew that she was scheduled to come in – when she left Friday around noon, she had already been told that she was going to be expected to come in Saturday . . . . We were not able to contact her before that Saturday came around about the fact that her employment had ended Friday. So because she didn't come in Saturday, that was not the reason

---

[9]On a line after the word "reason" the following notation was handwritten on the Status Change form: "1. Job Abandonment – left (walked out) w/o approval  2. Insubordination – refused to work Saturday10/24 [sic]." Appellant's Appendix at 263 (Status Change form).

-12-

she was terminated, but it did – it did add to our case or did add to the fact that she had chosen not to return to work.

Id. at 280-81 (deposition of Darren Blankenship).

In Young, the employer initially told the plaintiff that he was being discharged for "performance deficiencies," but later abandoned the "performance deficiencies" rationale and instead claimed that the plaintiff had been laid off due to a lack of available work. This Court observed that the plaintiff "produced evidence indicating that [the employer's] characterizations [of his alleged deficiencies] were at best carelessly inaccurate and at worst willfully exaggerated" and that the lack-of-work rationale was never mentioned to the plaintiff at the time of his dismissal. 152 F.3d at 1023. Under such circumstances, there was a genuine issue of fact regarding pretext. This Court explained:

> This evidence not only supports an inference that [the employer] has abandoned its initial stance, but also supports a reasonable inference that the company's current explanation is contrived.
>
> . . . .
>
> We conclude that a trier of fact could conclude from the foregoing evidence that Young's discharge was due neither to performance deficiencies, as [the employer] initially told him, nor to lack of available work, as the company now claims. When an employer has offered different explanations for an adverse employment action and when evidence has been presented that would allow a reasonable trier of fact to disbelieve each explanation, the trier of fact may reasonably infer that the employer is hiding something – that is, that the true explanation is unlawful discrimination.

Id. at 1023-24.

-13-

By contrast, in the present case, it is undisputed that Russell left her post in the middle of her shift on Friday, October 22, 1999, after specifically being told that doing so would result in an unscheduled absence. TG Missouri relied upon Russell's unscheduled departure from work as the basis for its initial decision to terminate her and did not abandon that rationale when it additionally cited her failure to show up for work on Saturday as another ground for her discharge. Each of the two justifications was asserted as soon as the underlying events occurred, and there is no issue of fabrication as to those underlying events. In sum, although Russell's failure to report for work on that Saturday was not a basis for TG Missouri's initial decision to terminate her (made the day before), we cannot reasonably construe TG Missouri's subsequent reliance upon that ground as evidence of pretext or discriminatory motive.

We now turn to Russell's pretext argument based upon a disparate treatment theory. She maintains that two similarly situated employees of TG Missouri, Lance Evans and Brad Drew, were disciplined less severely for engaging in violations of comparable seriousness to hers. See Brief for Appellant at 50-52.

In order to create a reasonable inference of pretext on this disparate treatment theory, Russell must show, among other things, that, at the time of their respective violations, she and Evans, or she and Drew, were similarly situated in all relevant respects and yet she received a more severe punishment for committing substantially the same offense. See Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 972 (8th Cir. 1994) ("Employees are similarly situated when they 'are involved in or accused of the same offense and are disciplined in different ways.'") (quoting Boner v. Bd. of Comm'rs, 674 F.2d 693, 697 (8th Cir. 1982)). As Russell suggests, it is not necessary that she prove that the violations were identical, just that they were of "comparable seriousness." See Lynn v. Deaconess Med. Ctr.–W. Campus, 160 F.3d 484, 488 (8th Cir. 1998) ("To show that employees are similarly situated, a plaintiff need only establish that he or she was treated differently than other employees whose violations were of 'comparable seriousness.' To require that employees always have to engage

-14-

in the exact same offense as a prerequisite for finding them similarly situated would result in a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination. Common sense as well as our case law dictate that we reject such an approach." (citations and footnote omitted)).

The record contains uncontradicted evidence demonstrating that Evans and Drew each received a warning for their respective infractions after committing offenses that were less egregious than Russell's. Evans left work early after he obtained permission to leave from one of his supervisors; a different supervisor was unaware of that fact and considered it an unscheduled absence. See Appellant's Appendix at 138 (deposition of Darren Blankenship) ("[Evans] claimed that his manager gave him permission to be off that day, or at least part of the day. So when he came in to work, I believe his expectation was that he could have off at least part of the day. And when we looked into it, we did talk to the manager who he claimed to have gotten permission from. That manager did state that she gave him permission to take off, she just never had it written down in the books."); 153 (Investigation Summary by Missouri Commission on Human Rights in Russell v. TG Missouri Corp., MCHR Case No. E-12/99-19847("MCHR Investigation Summary")) (stating same). By contrast, Russell left early without obtaining permission from any of her superiors. Drew refused to work an overtime shift; however, the overtime was to follow directly after a full eight-hour shift, which he did complete. See id. at 153 (MCHR Investigation Summary) ("[TG Missouri] states that it did not fire [Drew] because he had worked a full shift, eight hours, but left after eight hours because he was upset that no one had told him in advance that he would have to work overtime."). By contrast, not only did Russell refuse to work overtime on that Saturday, October 23, she did not even complete her regular shift on Friday, October 22. Thus, we cannot reasonably conclude that Russell's infraction, and those

-15-

committed by Drew and Evans, were of comparable seriousness. Russell's disparate treatment argument does not establish a genuine dispute regarding pretext.[10]

We next consider Russell's pretext argument based upon the claim that TG Missouri failed to follow its own policies when it terminated her for leaving early without permission on Friday, October 22. Russell maintains that, consistent with TG Missouri's own definitions, her early departure from work without permission was an unscheduled absence, not job abandonment. She contends that under TG Missouri's written progressive disciplinary policy addressing absences, see Appellant's Appendix at 255-61, she should have received a written warning (step three), having previously in 1999 received no more than one documented oral warning (step two). Moreover, she points out, the policy does not provide for termination until the eighth incident of unplanned/unscheduled absence within a twelve-month period, id. at 260-61, and hers was at most the third such incident. Russell also argues that there is a "very well known verbal policy that three days 'no-call no-show' will result in termination," Brief for Appellant at 48 (citing Appellant's Appendix at 196-97 (deposition of Taunya Russell)), and yet she was terminated after committing an infraction that was far less serious than a three-day absence without notice. These discrepancies between company policies and the manner in which she was actually treated, she concludes, provide sufficient evidence that her unauthorized departure from work on Friday, October 22, was not the true reason for her termination but was merely a pretext for unlawful discrimination.

_____

[10]TG Missouri also argues that Russell's disparate treatment theory fails because Russell cannot show that Evans and Drew are outside of the relevant protected class of disabled persons, noting that Evans is severely diabetic and Drew is deaf. In response, Russell argues, at least with respect to Evans, that no request for accommodation was ever made and that no disability within the meaning of the ADA has been proven. Because we dispose of the disparate treatment issue by comparing relevant workplace violations, we need not address this issue.

We agree with Russell that an employer's deviation from its own policies can, in some instances, provide evidence of pretext. However, in the present case, TG Missouri's written policy governing unscheduled absences allowed for the disciplinary action that was taken against Russell. In its opening paragraph, the written policy on absenteeism makes clear that the step-by-step procedures set forth therein are "guidelines" and that there are no fixed rules governing the treatment of absenteeism. The policy provides:

> Managing absenteeism is one of the more difficult job performance issues facing supervisors and managers. These are not the kind of issues that can be controlled by the stringent application of fixed rules and regulations. Each case must be reviewed on its own merits, therefore, generally prohibiting the use of a finite formula. Absence control requires a high degree of supervisory/managerial judgment coupled with appropriate counsel from the Human Resources Department.

> The following guidelines can be a useful tool and standard which, when utilized by management, should provide a reasonable level of consistency and equity when confronted with these kinds of problems.

Appellant's Appendix at 255.

As we have said many times, we do not sit as a "super-personnel department" with the power to second-guess employers' business decisions. See, e.g., Harvey, 38 F.3d at 973 (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). In the present case, Russell was specifically told that it would be an unscheduled absence if she left, and yet she abandoned her post in the middle of her shift. Whether her departure under these circumstances was technically an unscheduled absence or job abandonment, it provided a legitimate nondiscriminatory basis for TG Missouri to take disciplinary action. The absenteeism policy upon which Russell relies expressly affords supervisors and managers latitude in determining an appropriate disciplinary response to an unscheduled employee

-17-

absence. We therefore cannot reasonably infer that TG Missouri's stated explanation for discharging Russell was a pretext for discrimination based upon her disability.

## B. *Sex discrimination claim*

Russell also maintains that the District Court erred in granting summary judgment on her claim of sex discrimination under Title VII. In support of this claim, she relies upon a disparate treatment theory, again identifying Drew and Evans as employees who received less severe discipline for allegedly comparable infractions. For the same reason that we have rejected her disparate treatment argument vis-a-vis her disability discrimination claim under the ADA, we reject Russell's disparate treatment argument vis-a-vis her sex discrimination claim under Title VII. As explained above, in accordance with facts not genuinely disputed, we cannot reasonably infer that the infractions committed by Drew and Evans were of comparable seriousness to Russell's.

## C. *Retaliation claim*

Finally, Russell argues that the District Court erred in holding that she failed to exhaust her administrative remedies with respect to her retaliation claim. She contends that her retaliation claim is reasonably related to, or grows out of, the substance of her allegations in the administrative charge and therefore was sufficiently exhausted. Brief for Appellant at 55-57 (citing, e.g., Stuart v. Gen. Motors Corp., 217 F.3d 621, 631 (8th Cir. 2000) (recognizing that a claim is administratively exhausted if it is specifically stated in, grows out of, or is reasonably related to the substance of the allegations in an administrative charge or complaint)). In support of this argument, Russell highlights the following statement contained in her administrative charge: "I believe Respondent wanted to fire me because I could only work 8 hours a day, 5 days a week due to my condition." Appellant's Appendix at 285. In addition, she notes that, on a document entitled "Initial Complainant

Interview" submitted to the MCHR, she wrote that the Saturday cleaning assignment was "punishment from [Blaylock] because [she] had a doctor's excuse for 8 hours only." Id. at 297.[11]

We first note that the "Initial Complainant Interview," which Russell submitted to the MCHR, is not part of the administrative complaint or charge. See Appellant's Appendix at 296 (Initial Complainant Interview) (stamped "THIS IS NOT A COMPLAINT FORM"). Consequently, that document is irrelevant to the question of whether Russell exhausted her administrative remedies. See Stuart, 217 F.3d at 630-31 (exhaustion of administrative remedies requires a claimant to give notice of all claims of discrimination in the initial administrative complaint or charge).

As to the administrative charge Russell submitted to the EEOC and the MCHR, it is undisputed that she failed to specifically assert a retaliation claim. While she did check the box for, and allege, a claim of disability discrimination, she cannot rely on that claim to show that she exhausted her administrative remedies with respect to her retaliation claim because "it is well established that retaliation claims are not reasonably related to underlying discrimination claims." Wallin v. Minn. Dep't of Corrections, 153 F.3d 681, 688 (8ᵗʰ Cir. 1998), cert. denied, 526 U.S. 1004 (1999). That leaves us to consider whether Russell's retaliation claim is reasonably related to, or grows out of, the statement in the administrative charge: "I believe Respondent wanted to fire me because I could only work 8 hours a day, 5 days a week due to my condition." Appellant's Appendix at 285.

To satisfy the exhaustion requirement, the statement in question must provide sufficient notice of Russell's retaliation claim. See Wallin, 153 F.3d at 688

---

[11]On this document, following the instructions: "Do you believe you were discriminated against because of: Indicate your race, color, religion, sex, etc. by the box checked," Russell did not check the box labeled "Retaliation." She checked only the box labeled "Disability." Appellant's Appendix at 296.

("'Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.'") (quoting <u>Williams v. Little Rock Mun. Water Works</u>, 21 F.3d 218, 233 (8th Cir. 1994)). The statement in question arguably does provide notice that retaliation is being alleged; however, it suggests that retaliation was a motive for Russell's termination, not for the overtime assignment that she now claims was the retaliatory act. <u>See</u> Appellant's Appendix at 13 (Complaint, ¶ 30) (alleging TG Missouri retaliated against her "by scheduling her to work in excess of 40 hours per week by requiring her to come in on the weekend"). Russell's retaliation claim, as asserted in the present litigation, is therefore not reasonably related to the substance of her allegations in the administrative charge. <u>Cf. Stuart</u>, 217 F.3d at 631 (explaining that where the plaintiff alleged in her EEOC charge that she was *terminated* in retaliation for engaging in protected activity, she had not exhausted her administrative remedies with respect to a claim that she had been *disciplined* in retaliation for engaging in protected activity).

Finally, as the District Court observed, Russell has not alleged that the retaliation resulted from her filing the administrative charge. The alleged retaliation occurred well before the administrative charge was filed. We therefore further conclude that Russell's retaliation claim does not grow out of the substance of her allegations in the administrative charge. <u>See Wallin</u>, 153 F.3d at 688-89 (retaliation claim did not grow out of the substance of the allegations in the administrative charge where the alleged retaliation "was not the result of [the plaintiff's] filing of the EEOC charge" and "occurred at the same time as the alleged discrimination, long before he filed a charge of discrimination with the EEOC.")).

In sum, we hold that Russell has failed to exhaust her administrative remedies for purposes of her retaliation claim. Regardless of whether the evidence supports a reasonable inference that Blaylock was acting with a retaliatory animus when he

ordered Russell to report to work on Saturday, October 23, 1999, her retaliation claim is barred as a matter of law.

## IV.

For the reasons stated, the order of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.