Shane J. BEATTY, Plaintiff,

v.

**CUSTOM–PAK, INC., Defendant.**

No. 3:08–cv–00058–JEG.

United States District Court,
S.D. Iowa,
Davenport Division.

June 8, 2009.

Daniel D. Bernstein, Earl A. Payson, Davenport, IA, for Plaintiff.

Dorothy A. O'Brien, Attorney & Counselor Law, PLC, Davenport, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on a Motion for Summary Judgment brought by Defendant Custom–Pak, Inc. (Custom–Pak). The Court held a hearing on the Motion on May 7, 2009. Earl Payson and Daniel Bernstein represented Plaintiff Shane J. Beatty (Beatty), and Dorothy O'Brien represented Custom–Pak. The matter is fully submitted and ready for disposition.

## I. SUMMARY OF MATERIAL FACTS [1]

Beatty began working as a machine operator at Custom–Pak in February 2006.

---

1. The Court views the factual background as either undisputed or in the light most favorable to the Plaintiff. *See, e.g., STL 300 N. 4th,*

He was an employee who over time had garnered a history of disciplinary issues, including tardiness, absenteeism, and failure to do quality checks. In May 2006, Custom–Pak issued a written warning to Beatty for failing to give Custom–Pak notice prior to being absent from work. On another occasion, Beatty failed to come in to work an early shift for which he had been scheduled.

As part of his job as a machine operator, Beatty was responsible for doing quality checks four times per day on the parts he manufactured. However, the parts Beatty manufactured repeatedly failed to meet quality standards. In May 2006, Beatty received a written warning for failing to do the required quality checks, a mistake which resulted in over four hundred parts being rejected for failure to meet quality standards. That same month, Beatty also received a low performance evaluation score, which caused Custom–Pak's human resources coordinator Vicki Rixen (Rixen) to consider terminating Beatty's employment.

Beatty's next discipline came in July 2006 when he received a written warning for taking an overly long break. In October 2006, Beatty was given a warning about his attendance problems for the previous six months. That same month, Beatty received a warning for neglecting to include some hardware in a shipment of plastic toilet seats. In order to remedy the problem, Custom–Pak had to open each package, insert the omitted hardware, and close the package again.

In February 2007, Beatty received yet another warning for failing to perform quality assurance on his parts. On that occasion, Beatty's supervisors had told him four times to identify the parts he made by stamping his name on them; but Beatty failed to do so. One month later, in March 2007, Beatty received his fourth attendance-related written warning, this time for failing to report to work at his scheduled time.

In May 2007, Custom–Pak made an investigation into a harassment complaint from one of Beatty's co-workers, Justin Ploog, who alleged that Beatty had waived his penis at Ploog. Custom–Pak assigned Jay Claeys (Claeys), an operations facilitator, to investigate the complaint. Two Custom–Pak coaches who were present at the time of the alleged incident said they had not observed anything. Beatty denied the specific details of the incident, though he did admit that some horseplay had been going on. Ultimately, Claeys concluded that there was not enough evidence to either exonerate Beatty or determine that he was at fault.

In June 2007, Custom–Pak gave Beatty a "final warning" regarding his employment status. However, the particular performance failure was neglecting to do quality checks during the last four hours of his shift, and the required improvement addressed the consistency of these quality checks.

The record reflects Beatty's managers were very dissatisfied with Beatty's work performance. In May 2007, Custom–Pak supervisor Lori Wenger sent an email to the other managers complaining that Beatty was talking to a friend of his instead of working. Claeys assessed Beatty as an "immature kid" who, while capable of performing his job adequately, chose not to do so. Despite Custom–Pak's policy that machine operators were not supposed to shut down their machines in order to get their own parts, Beatty admitted to shutting down his machine and abandoning it for up to ten minutes at a time because he ran out of necessary parts. Claeys also re-

ceived complaints from supervisors that Beatty would shut off his machine and walk around while the supervisors were not looking.

Amanda Montroy (Montroy), Beatty's supervisor during his final six months of employment, had similar complaints: about once a week Montroy would find that Beatty had shut down his machine and was visiting with co-workers instead of working. In addition, Montroy considered Beatty one of her less productive employees and said she had problems with Beatty becoming argumentative when she would ask him to perform tasks.

Production manager Jessica Streeper (Streeper) felt that, while Beatty was a competent machine operator, he was disrespectful of authority. Streeper's opinion was based partly on conversations she had with Montroy about Beatty's argumentative demeanor and partly on personal interactions with Beatty in meetings, where he would talk to other employees and not pay attention while Streeper was presenting. Streeper was also involved in giving Beatty his "final warning" in June 2007, commenting that, of all the quality-assurance problems Custom–Pak had experienced with its employees, Beatty's was a very big deal and would require improvement. Plant Manager Ron Zimmer (Zimmer) described Beatty as "one of the poorest performers" at the factory, not because of his ability to operate the machines but because of his failure to follow rules and perform quality checks. Zimmer also said that Beatty's poor interaction with his supervisors was a constant issue.

Custom–Pak has a policy of awarding a twenty-cent-per-hour premium pay to employees who have perfect attendance. With the exception of approved leave such as that taken under the FMLA, an employee who misses a day loses the premium for sixty days. At the end of the sixty days, the employee can again qualify anew for the premium. Beatty qualified for the premium intermittently throughout his employment with Custom–Pak and was qualified during the summer of 2007. However, on August 3, 2007, Beatty called in to give notice that he would not be reporting for his scheduled shift. Because of this absence, Custom–Pak removed Beatty's perfect-attendance premium pay for the following week.

On August 6 or 7, 2007, Beatty had a flare-up of a pre-existing hernia, which caused him to seek medical attention. Beatty's doctor wrote a note that recommended Beatty be switched to a light-duty shift, which Beatty presented to Rixen on or about August 7, 2007. Rixen advised Beatty that Custom–Pak did not offer light duty but that he could either take FMLA leave or have his doctor return him to full duty. Beatty returned on September 5, 2007, with another doctor's note, this time releasing him to work full duty. Rixen helped Beatty fill out the FMLA paperwork to cover his four weeks absence and retroactively approved his FMLA leave.

The next day, September 6, 2007, Beatty reported to work for the first time following his FMLA leave. At some point during the shift, Zimmer came through the plant giving certain employees a fifty-dollar bonus because the plant had met its production goals. Though Beatty testified that the bonus was only given to employees that had been at Custom–Pak during the production period, Beatty also received the production bonus even though he had been on FMLA leave during the production period.

At the end of his shift, Beatty became frustrated that co-worker Jamie Assenmacher (Assenmacher) was not helping to clean up the machines. Beatty was upset because the employees could not leave work until the cleaning was finished, and he approached Montroy to ask her why

Assenmacher was not helping to clean up. Montroy explained that Assenmacher was training another employee and needed to remain with the trainee for safety reasons. Beatty asked why Assenmacher was allowed to talk to the maintenance workers, then abruptly left and returned to his workstation before Montroy could reply. Montroy testified that Beatty had "a little bit of an attitude," that he became "snippy" towards her, and that she could tell by Beatty's voice that he was angry that Assenmacher had not been cleaning. Def. SOF at ¶ 54; Pl. Resp. to Def. SOF at ¶ 54; Def. App. at 56, 59, Dep. 19, 34.

According to Assenmacher and co-workers Hannah Stebens (Stebens) and LaRee Krogman (Krogman), they were talking in the factory parking lot after the shift ended when they saw Beatty drive past them and yell something at Assenmacher. None of the women related exactly what Beatty allegedly yelled, but Stebens described it as "rude" and containing "vulgarities and swear words," and Krogman described it as "derogatory." Def. App. at 24, 48, 68–69. At the time the alleged incident occurred, Assenmacher was facing away from Beatty's vehicle. Beatty denies he said anything and claims the only thing he did in the parking lot was to make plans to meet up with other co-workers at a local bar. Custom–Pak employee Josh Wulf (Wulf), who was a passenger in Beatty's car that night, testified that Beatty did not say anything to Assenmacher. Instead, Wulf said that he and Beatty were listening to loud, angry, heavy-metal music and were singing and getting into the music.

Several minutes after the alleged incident, Stebens saw Montroy leaving the plant and asked her to join the group of women. Stebens told Montroy that Beatty was yelling things at Assenmacher that were cruel and harassing.[2] The next morning, Montroy called her supervisor, Streeper, and informed her of the previous night's events.

After receiving the news from Montroy, Streeper shared it with Rixen. Rixen then interviewed the three women, as well as other employees that had been in the parking lot, about what had allegedly occurred. Rixen testified that, in her interviews with Stebens and Assenmacher, one or both of the women told her that Beatty had used the "F word" when he yelled at Assenmacher. After talking about the information Rixen collected from the interviews, Rixen and Streeper reviewed Beatty's personnel file; however, they did not specifically discuss the May 2007 harassment allegation that Ploog made against Beatty. Streeper favored terminating Beatty based on (1) the alleged incident in the parking lot, which she described as aggression towards another employee and (2) Beatty's disrespect for authority, which she had both observed personally in meetings and heard about from Beatty's supervisors. Rixen also favored termination due to Beatty's overall history and behavior at Custom–Pak during his employment.

Streeper and Rixen then shared their decision to terminate Beatty with Zimmer, who had requested that a decision be made about termination before Beatty returned to work. Zimmer wanted a quick decision because he was concerned that the employees who had witnessed the scene in the parking lot would be uncomfortable working around Beatty. Zimmer favored termination and believed that Beatty's status as an employee was at risk due to all the warnings and incidents in which Beatty had been involved. Zimmer also felt that Beatty was constantly making decisions

2. While Beatty denies having yelled in the parking lot, he does not contest that Assenmacher, Stebens, and Krogman related the incident to Montroy or that they were interviewed the next day as part of Custom–Pak's investigation into the incident.

that were not in Custom–Pak's best interests. While the record is unclear as to who had ultimate responsibility for making the final call, the decision was made to terminate Beatty's employment.

That afternoon, Rixen called Beatty at home and told him he was being terminated because he was not a good fit with the company. Rixen did not go into details regarding the alleged incident in the parking lot in an effort to avoid any potential retaliation against the women who had reported that incident. For the same reason, Rixen also informed Beatty that he was barred from coming on Custom–Pak's property and that, if he did so, the police would be called to arrest him for trespassing, though this was not Custom–Pak's policy with respect to all terminated employees.

At the time it terminated Beatty's employment, Custom–Pak was subject to the Family Medical Leave Act (FMLA) and was actively looking to hire forty more full-time employees to meet its production goals. Beatty filed the present lawsuit in state court on April 17, 2008, asserting claims for (1) interference with his rights under the FMLA, 29 U.S.C. § 2615, and (2) wrongful discharge in violation of public policy under the FMLA. Custom–Pak removed the action to this Court on May 21, 2008. Custom–Pak moves for summary judgment, arguing that Beatty cannot maintain his FMLA claims because (1) he was not terminated while on FMLA leave, and (2) Custom–Pak terminated Beatty for a reason unrelated to his exercise of rights under the FMLA.

## II. APPLICABLE LAW AND DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is appropriate when no genuine issue of material fact remains and the movant is entitled to judgment as a matter of law.... [I]f the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Walnut Grove Partners, L.P. v. Am. Family Mut. Ins. Co.*, 479 F.3d 949, 951–52 (8th Cir.2007) (citing Fed. R. Civ. P. 56(c) (internal quotation omitted)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to defeat a motion for summary judgment, the nonmoving party "may not rely merely on allegations or denials in its own pleading," it must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "In considering a motion for summary judgment the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Thomas v. Corwin*, 483 F.3d 516, 526–27 (8th Cir.2007). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1110 (8th Cir.2007) (quoting *Thomas*, 483 F.3d at 527). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc.*, 382 F.3d 852, 856 (8th Cir. 2004).

■ While it is common to recognize that "[s]ummary judgment should seldom be granted in discrimination cases," *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir.2000), still, in discrimination cases, the plaintiff is not entitled to survive summary judgment merely by establishing a prima facie case, *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 365 (8th Cir.1994) (citing *Hebert v. Mohawk Rubber Co.*, 872 F.2d 1104, 1111 (1st Cir.1989)). The "plaintiff's evidence must be sufficient to raise a gen-

uine issue of material fact regarding [the] defendant's reason for the employment action taken." *Id.; see also Berg v. Norand Corp.*, 169 F.3d 1140, 1144 (8th Cir.1999) ("There is no 'discrimination case exception' to the application of Fed. R. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial.").

The party seeking summary judgment initially bears the burden of demonstrating the absence of any genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. If the moving party satisfies its burden, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "The mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. The substantive law determines what facts are material; "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### B. FMLA Interference

Beatty alleges that by terminating his employment the day after he returned from FMLA leave, Custom–Pak interfered with his rights under the FMLA. Custom–Pak moves for summary judgment on the basis that no issues of material fact remain, and, because it afforded Beatty all the protections given by the FMLA, it is entitled to judgment as a matter of law.

The FMLA provides in relevant part that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period ... [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). A covered employer who interferes with, restrains, or denies exercise of any right for leave under the FMLA is subject to a claim for compensatory damages and, unless the Court finds the violation occurred in good faith, additional liquidated damages. 29 U.S.C. §§ 2615(a)(1), 2617(a)(1)(A); 29 C.F.R. § 825.220(c). The regulations specifically provide that FMLA leave time cannot be counted under a "no-fault" attendance policy. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(c).

■ To establish his interference claim under 29 U.S.C. § 2615(a)(1), Beatty must prove five elements: (1) Beatty was an eligible employee; (2) Custom–Pak was an employer as defined by the FMLA; (3) Beatty was entitled to FMLA leave; (4) Beatty gave Custom–Pak notice of his intent to take FMLA leave; and (5) Custom–Pak denied Beatty FMLA benefits to which he was entitled. *See Schoonover v. ADM Corn Processing*, No. 06–CV–133–LRR, 2008 WL 282343, at *12 (N.D.Iowa, Jan. 31, 2008) (citing 29 U.S.C. §§ 2611(2), (4); 2612(a)(1), (e)(1)). There is no dispute that Beatty qualifies as an eligible employee as Custom–Pak had employed him for over twelve months and for at least 1250 hours of service during the preceding year. 29 C.F.R. § 825.110. Nor is there any dispute that Custom–Pak qualifies as an employer under the FMLA because it was a business that employed fifty or more employees for each working day during each

of twenty or more calendar workweeks in the current or preceding calendar year. 29 C.F.R. § 825.104.

■ It is undisputed that Custom–Pak approved Beatty's FMLA leave request retroactively and took no adverse action against Beatty while he was on leave, and therefore Custom–Pak did not deny Beatty any FMLA benefits to which he was entitled. Beatty aptly states that his FMLA interference claim is not his "primary focus," as he has failed to show any evidence that would support an FMLA interference claim. *See Schoonover,* 2008 WL 282343, at \*12. Thus, on this record, the Court finds Beatty failed to prove a prima facie case of FMLA interference, supporting summary judgment in favor of Custom–Pak on the interference claim.

## C. FMLA Retaliation

Beatty claims that he was wrongfully terminated for pursuing his rights under the FMLA. Custom–Pak moves for summary judgment on the basis that no material facts exist and, because Beatty cannot establish a causal connection between his termination and his exercise of his FMLA rights, Custom–Pak is therefore entitled to judgment as a matter of law.

■ The FMLA prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual" for asserting his rights under the FMLA. 29 U.S.C. § 2615(a)(2); *Hite v. Vermeer Mfg. Co.,* 446 F.3d 858, 865 (8th Cir.2006). Additionally, an employer "may

not consider an employee's use of FMLA leave as a negative factor in an employment action." *Hite,* 446 F.3d at 865.

■ "The employee bears the ultimate burden of proving that FMLA leave was the determinative factor in the negative employment action." *Bumgarner v. Grafco Indus., LP,* 581 F.Supp.2d 1052, 1060 (S.D.Iowa 2008); *see also* S. Rep. No. 103–3 at 34 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 796, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Under the familiar burden-shifting analysis established in *McDonnell Douglas Corp. v. Green,* the employee must first "establish a prima facie case of retaliatory discrimination by showing that [he] exercised rights afforded by the [FMLA], that [he] suffered an adverse employment action, and that there was a causal connection between [his] exercise of rights and the adverse employment action."[3] *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817. Second, after the employee establishes his prima facie case, the burden shifts back to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* at 833, 93 S.Ct. 1817. Finally, the burden shifts back to the employee to demonstrate that the reason offered by the employer is a pretext for discrimination. *Id.*

It is undisputed that Beatty's leave constituted an exercise of his rights under the FMLA and that he suffered an adverse employment action when Custom–Pak terminated his employment.[4] The remaining

---

**3.** There are two ways for a plaintiff to establish a prima facie case of FMLA discrimination: (1) through direct evidence of discrimination, or (2) by presenting circumstantial evidence of discriminatory intent. *See, e.g., Beal v. Rubbermaid Commercial Prods.,* 972 F.Supp. 1216, 1229 (N.D.Iowa 1997) (quoting *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1081 (11th Cir.1990)). "Only the most blatant remarks, whose intent could be nothing other than to discriminate ... constitute

direct evidence of discrimination." *Id.* Because Beatty does not allege that Custom–Pak made any such remarks, he cannot establish a prima facie case through direct evidence.

**4.** Beatty concedes that Custom–Pak did not take an adverse employment action against him for taking FMLA leave when it removed his perfect attendance pay after his non-FMLA absence on August 3.

issue in establishing a prima facie case is whether Beatty can show a causal connection between his exercise of FMLA rights and adverse employment action. To "establish a causal link between the employee's exercise of FMLA rights and [his] termination, the employee must prove that an employer's retaliatory motive played a part in the adverse employment action." *Hite*, 446 F.3d at 865 (internal quotation omitted).

■ While "[a]n employee can establish a causal link between [his exercise of FMLA rights] and the adverse employment action through the timing of the two events, ... [t]he mere coincidence of timing ... is rarely sufficient to establish the causation element." *Id.* at 866 (citation and internal quotation omitted). When courts have allowed temporal proximity alone to create an inference of the causal link, they "have uniformly held that the temporal proximity must be very close." *Id.* (quoting *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 859 (8th Cir.2005)). In this case, Beatty was fired the day after he returned from FMLA leave, and therefore this case presents one of the few instances where temporal proximity alone suffices to at least establish a genuine issue of material fact on the causation element of a prima facie case of retaliatory discrimination. Thus, the analysis must continue to the next step.

Under the *McDonnell Douglas* framework, the burden then passes to Custom–Pak to articulate a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. at 833, 93 S.Ct. 1817. At this stage, Custom–Pak's burden is one of mere production, not proof, and therefore it does not need to be made by a preponderance of the evidence. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1051–52 (8th Cir.2006) (quoting *Wallace v. Sparks Health Sys.*, 415 F.3d at 860). Custom–Pak must merely "provide evi-

dence sufficient to sustain a judgment in its favor." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir.2005).

■ As its justification for terminating Beatty, Custom–Pak points to the numerous complaints and warnings in Beatty's file, his marginal status as an employee, and the culminating report of the parking lot incident by employees with a more credible history. The law in this circuit is clear that an employer may legitimately terminate an employee for violating a company policy or procedure. *See, e.g., Quick v. Wal–Mart Stores, Inc.*, 441 F.3d 606, 610 (8th Cir.2006); *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir.2005); *Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("Our cases have repeatedly held that insubordination and violation of company policy are legitimate reasons for termination.").

■ With Custom–Pak's articulation of a nondiscriminatory reason for terminating Beatty, the burden then returns to Beatty to show that Custom–Pak's reason is a mere pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 833, 93 S.Ct. 1817. At this stage, Beatty's burden "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to prevail on his claim, Beatty must "(1) present evidence creating a fact issue as to whether the employer's proffered reason is pretextual; and (2) present evidence that supports a reasonable inference of unlawful discrimination." *Russell v. TG Mo. Corp.*, 340 F.3d 735, 743 (8th Cir.2003).

■ Evidence used in the first step of the *McDonnell Douglas* analysis to support a prima facie case can be considered

in conjunction with other evidence to decide if a genuine issue of material fact exists with respect to the ultimate issue. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 & n. 2 (8th Cir.2006). As a result, a strong prima facie case coupled with evidence showing the employer's rationale for the termination is false can be sufficient to generate a genuine issue of material fact with respect to whether the employee was terminated for an improper reason. *Id.; accord Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir.2005); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir.2002).

There are at least two primary ways a plaintiff can overcome a showing of a legitimate and nondiscriminatory reason proffered by a defendant. "First, a plaintiff may succeed 'indirectly by showing that the employer's proffered explanation is unworthy of credence' because it has 'no basis in fact.' " *Wallace v. DTG Operations*, 442 F.3d at 1120 (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089). This method of proof, which "directly rebut[s] the proffered reason as false, usually involves more than a rebuttal of the employer's ultimate claims regarding its subjective motivations," and more "typically involves a broader rebuttal of the underlying factual claims." *Id.* If the employer's explanation withstands analysis as "worthy of credence," the plaintiff does not succeed. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Second, a plaintiff may prove pretext "by persuading the court that a [prohibited] reason more likely motivated the employer." *Wallace v. DTG Operations*, 442 F.3d at 1120. Under this alternative, Beatty must show that the record contains sufficient evidence of intentional discrimination for a reasonable fact finder to believe his allegations and conclude that Custom–Pak's proffered reason was not the real reason for Beatty's termination. *Id.* at 1121.

Whichever path Beatty chooses to travel, he "must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a 'phony excuse.' " *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir.2005). The Eighth Circuit has summarized the most common methods to show pretext as follows:

> An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees [were treated differently], that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

*Stallings*, 447 F.3d at 1053 (citing *Smith*, 302 F.3d at 834–35).

Beatty argues that he said nothing to Assenmacher in the parking lot and denies the veracity of Assenmacher, Stebens, and Krogman's statements to Montroy and Rixen. However, Beatty's argument misses the point; regardless of the events that did or did not occur in the parking lot, Custom–Pak's explanation is that Beatty was terminated because Rixen, Streeper, and Zimmer believed Assenmacher, Stebens, and Krogman's accounts of what occurred. To show he was terminated for an untenable reason, Beatty must generate a fact question regarding whether the Custom–Pak management's belief was reasonable. No genuine issue of material fact is created by the mystery surrounding the precise actions or comments of Beatty in the parking lot. The issue at this juncture is not whether Beatty actually made the characterized statements; the issue is whether, under the fragile nature of Beatty's employment status at Custom–Pak, management's acceptance of the report of the other employees over Beatty's version

constituted a pretext for what was in fact retaliation.

Two cases fully illustrate what Beatty must show. In *Mershon v. St. Louis University,* a University student claimed he was banned from campus in retaliation for reporting the University's failure to accommodate his disability. *Mershon v. St. Louis University,* 442 F.3d 1069, 1074 (8th Cir.2006). In the course of reporting the failure to accommodate, the student told a government investigator that the student "want[ed] to put a bullet" in a specific professor's head as a result of interactions with the professor that had upset the student. *Id.* at 1073. The investigator told a University security official about the student's statements, which resulted in the student being prohibited from entering the University's campus. *Id.*

The court held that the plaintiff generated a fact question on each element of his prima facie case by showing that he reported conduct allegedly amounting to a failure to accommodate and was banned from campus the next day. *Id.* at 1074. The University's proffered explanation was that the student's complaint was "perceived as a threat to harm a professor and that campus security simply acted to protect the University faculty and students from threatened violence." *Id.* While the parties disputed whether the student had actually made the threats, that factual dispute was not material. *Id.* at 1074–75. The court noted that the plaintiff did not dispute that the University "sincerely perceived that he had made a threat" and that the investigator had "communicated to others her perception that he had made a threat." *Id.* The court concluded that "even assuming as true that [the student] had never intended to harm [the professor], there is no dispute that the University reasonably believed and acted upon [the government investigator's] report and her perception that [the student] had made a threat against a faculty member." *Id.* at 1075. Because the student did not show "that the University's proffered explanation for the adverse action was false or that the University acted in bad faith in relying on [the investigator's] report," he could not rebut the University's reasons for banning him from campus even if he did not make the threat against his professor. *Id.; see also Twymon v. Wells Fargo & Co.,* 462 F.3d 925, 935–36 (8th Cir.2006) (upholding the district court's conclusion that the plaintiff, accused of violating a corporate computer policy, failed to show pretext when she "[did] not assert that [her employer] did not honestly believe she was accountable for violations of the computer policy when they fired her for those violations"); *Johnson v. AT & T Corp.,* 422 F.3d 756, 762–63 (8th Cir.2005) (finding that even if an employer was mistaken in its belief that an employee made bomb threats, that fact does not prove the employer was motivated by unlawful discrimination absent proof that the employer did not honestly believe the employee made bomb threats); *Scroggins v. Univ. of Minn.,* 221 F.3d 1042, 1045 (8th Cir.2000) (defining the relevant pretext inquiry as whether the employer honestly believed an employee was guilty of conduct justifying the discharge).

Similarly, in *EEOC v. Trans States Airlines, Inc.,* a race and religion discrimination case advanced under Title VII and an analogous state statute, an airline pilot was terminated for violating a company policy after he was allegedly seen in a hotel bar in uniform. *EEOC v. Trans States Airlines,* 462 F.3d 987, 992 (8th Cir.2006). Upholding the district court's conclusion that the plaintiff had failed to rebut this legitimate, nondiscriminatory reason for the pilot's termination, the court noted that whether the pilot actually violated the company's policy was not a material dispute. *Id.* Instead, "[t]he relevant question

is whether [the pilot] can show that [the airline] was motivated by a discriminatory animus, rather than solely by its belief that [the pilot] violated company policy." *Id.* (citing *Scroggins,* 221 F.3d at 1045).

■ These cases teach that Beatty must generate a fact question regarding whether Custom–Pak's explanation for his termination was false or dishonest, whether it acted in bad faith in relying on the information Rixen and Montroy collected, or whether its reliance on that information was unreasonable. Even assuming that Custom–Pak's investigation of the parking lot incident reached an incorrect conclusion, as long as the record is devoid of fact questions as to whether Rixen, Streeper, or Zimmer had an improper motive in their decision to terminate Beatty, Beatty's claim fails.

Beatty is unable to generate a fact issue that Custom–Pak's explanation is a pretext for discrimination. Beatty has failed to produce any evidence that his exercise of his FMLA leave had any effect whatsoever on Custom–Pak's decision. At this point in the analysis, the temporal proximity of his discharge to his period of medical leave merges with the ultimate events in the parking lot leading to the discharge. Beatty was a problem employee, with multiple warnings, including a "final warning" just three months prior to his termination for neglecting his job responsibilities. He had repeated attendance issues, including absenteeism and tardiness. He had been the subject of a sexual harassment investigation, which, although it failed to produce evidence of his culpability, nevertheless revealed that he was engaging in horseplay on the job. Beatty argued with his supervisor when asked to perform tasks and conveyed an attitude of disrespect to his superiors by talking during staff meetings.

Beatty has not produced other evidence of pretext such as having "received a favorable review shortly before he was ter-

minated, that similarly situated employees [were treated differently], that [Custom–Pak] changed its explanation for why it fired [Beatty], or that [Custom–Pak] deviated from its policies." *Stallings,* 447 F.3d at 1053. No derogatory comments were made by anyone at Custom–Pak about Beatty's application for or exercise of FMLA leave, nor has Beatty produced any evidence that Custom–Pak had a history of interfering with or discriminating against employees taking FMLA. The only evidence in the record shows, quite to the contrary, that Custom–Pak took extra steps to accommodate Beatty by helping him fill out his FMLA form and retroactively approving his leave. The record is devoid of any evidence that Custom–Pak's proffered explanation was pretextual.

Therefore, Beatty has not established that there is a genuine issue of material fact regarding a causal connection between his exercise of FMLA rights and Custom–Pak's termination of his employment. With no causal connection demonstrated, Custom–Pak is entitled to summary judgment on the retaliation claim.

## III. CONCLUSION

Based upon the foregoing analysis, Defendant's Motion for Summary Judgment (Clerk's No. 9) must be **granted.** Beatty's case is hereby **dismissed.** The Clerk of Court is directed to enter judgment for the Defendant and against the Plaintiff.

**IT IS SO ORDERED.**